Good morning, Your Honors. Good morning. I'm Barry Weprin for the plaintiff appellant, and it's my intention to try to save at least three minutes for rebuttal. This is a securities fraud case, and the only issue on this appeal is whether the complaint adequately sets forth the scienter of defendants. Under this Court's standard, if any one allegation is sufficient to raise a strong inference of scienter, that's all we need. And if not, then you look at all the allegations holistically. Plaintiffs submit that the restatement in this case, along with the admissions by the company about the way trade credits were treated, itself constitutes an allegation that raises the necessary inference of scienter. In order to show why, I think you have to look at the extraordinary nature of what was admitted here. Trade credits generally are issued when goods are shipped to a customer, and for any reason they're returned, and there's a bookkeeping entry that says, you know, the company insight owes the customer money. That should be resolved either by sending the customer a check or giving the customer a credit for a subsequent bill. There is no reason logically why trade credits should be abandoned. I mean, it's money of the customer. What happened here? After a period of time, pursuant to a company policy, and it's admitted that this was a company policy that continued from basically from the time it became a public company in 1996 until 2009, after a period of time would vary. Usually the different confidential witnesses said it was 12 to 24 months. The company said it varied from time to time. Generally, we think it was 18 months. Now, that's a very significant period of time, whether it's 12 or 24, because it's after, if a customer hasn't asked for the money in 12 years, in 12 months, it makes it less likely, perhaps unlikely the customer is ever going to ask for it for whatever reason the customer forgot about it. But what would happen if they didn't release the credit? If they didn't release the credit, after three to five years, they would be required to escheat that credit, the money that trade credit represents, to the State where the customer was. So by the ---- Isn't there substantial variation in the escheatment laws from State to State? You're not ---- Is that why you use the term anywhere from three to five years, because it varies? The main difference, Your Honor, there really isn't substantial difference. And we gave examples of a dozen States. Well, let's take the time period. Is there a difference in the time period? Well, yes. Some States it's three years, some States it's five years. So if you're writing an accounting system, how do you account for that? Well, but the fact is that it shouldn't be that hard. You know which State the customer is. You know what the law is. And generally under the Uniform Act, and Arizona and Nevada and many of the other States where they have customers, I think it's something like 26 States now have the Uniform Act, where it makes clear that it's the State where the customer is whose law governs. And you just know what State you should know what State the customer is in and you know how long it is. You could take a computer program that says Arizona three years, Minnesota seven years, whatever it is. That's your point. Yes. And the fact is this is other people's money, Your Honor. It's not Insight's money. There is no logical reason why Insight, not just the accounting people at Insight, but the CEO, why anyone, defendants have never suggested it, why they would think that they had a right to take other people's money and declare it income to Insight, given that they knew that most of all of this now money was supposed to be issued to the States eventually. And I think that's really sufficient to establish SIENTA for Insight itself. And I know this Court, you know, in Glacier said it hasn't adopted a corporate SIENTA standard, but I think this is really very similar to the accounting cases against accounting firms and the New Mexico Investment Commission case against Ernst & Young, which we cite. This Court found that SIENTA was established against Ernst & Young as an entity without saying which that any particular accountant, you know, for pleading purposes, you know, had knowledge. And I think this is really similar to that. This is a corporate policy. This is intentional conduct by the corporation. This is not, you know, this is not your usual case. And I think that led to some confusion in the district judges trying to apply the case law. So what would the violation be here, a violation of GAAP? Yeah. Well, it's a violation of GAAP, but the fact is they're recognizing it's not they're taking money that they're inflating their earnings by taking money that belonged to other people and moving it from an account where I thought we had case law that said that a violation of GAAP is not per se evidence of SIENTA. That's right, Your Honor. And that's why I very carefully said at the beginning it's the violation of GAAP together with the explanation of what happened here. As far as I'm concerned, the GAAP fund Some of these amounts, as I understand it, were less than $50. The average was $600, Your Honor. And we gave an example The company whose sales are what? Well, the sales are in the billions over the period. And we're talking about amounts less than we're talking about pennies. Well, but no, we're not, Your Honor, because as we say in our reply brief, over the period 2004 to 2008, we're talking about 19.7 percent of net income. And the fact is this is not But what are the total sales over that period? I mean, it seems to me the numbers are still very small in comparison to the sales figures. Well, but again, but again, and we show in our complaint, we analyze it for each year. But for each year, the effect on net income was significant. And this is a company, I think if you look at it in the context of some of the other allegations, this is a company that was very concerned about meeting its quarterly numbers for sales and income. And I think it is material. First of all, we know it's material, because there wouldn't be a restatement if it wasn't material. And I would agree with Your Honor if it didn't go on for 13 years, and if it wasn't admitted that it was a company policy, and basically that there was no basis for it, not just in cap, but in logic. They're taking other people's money and declaring it to be their income. This goes to loss causation, but isn't this the case where the share price increased over the entire period of time? So that it's at the time you filed your complaint, the stock was actually worth substantially more than at the time of the Your Honor, the complaint, the stock price went down the day this was announced by 50 percent. When they talk about us filing the complaint, they're talking about the consolidated amended complaint, which was filed months later, and then the subsequent complaint, which was filed over a year later. And so that really does go to loss causation. How long was the stock depressed, I guess, as well? You alleged, what, a three-year period, the class period? Five years. Five years. So during that period, how long was the stock depressed? Well, the stock was not depressed. It was inflated during that period, and it went down when this was announced. And we're only seeking the damages that we're seeking, Your Honor, are limited to the amount that's caused by the wrong that we proved. That's really where I'm going with my question. I'm trying to figure out how your allegations of accounting violations affected the stock price. Well, the day they were announced, the stock price went down from 6 to 3. And over the next 90 days, which is the period you look at under the PSLRA, the stock did not come back to 6. And that's all that's relevant as a matter of law. Well, what is the claim loss to the parties? This is a class action, I assume. Yes. Well, that's going to be — What are we alleging is the loss to your clients? Well, the loss is the amount of inflation in the stock caused by this misrepresentation. There are established expert methods to do that, but it's certainly tens of millions if not hundreds of millions of dollars in this case. And, again, there's no — the issue in this appeal doesn't involve loss causation and doesn't involve the amount of the loss. Now, in addition to this — and, again, even if it's not corporate liability, you can certainly infer that the chief financial officers and the chief accounting officer who was fired immediately after this restatement was announced, you know, you can infer that they knew about the policy and that they knew the policy was wrong, not just because it violated CAP, but because it violated the normal way companies do business. I think you can infer the CEO did, too. There's some testimony — a statement from a confidential witness that at least the CEO had some discussions about the policy in connection with the acquisition of software. I thought the district court found that there was a problem with regard to the — I'll call it competency of your confidential witnesses in either not being in a position to know or not having direct knowledge that could be attributed to the named corporate officers. Yeah. And that's the incorrect standard, Your Honor. The standard that this Court set forth in Zucco, Portner, and Partners is they have to have knowledge based on their position about what they're testifying about. And they didn't testify. And they testified — They also said that the witness must be described with sufficient particularity to establish two things, their reliability and their personal knowledge. Yes. And we think we did that. If you look at the witnesses — because the witnesses testified about three things, which really contribute to the finding of Center. These are things you consider in the holistic analysis if you don't find the initial statement is enough. The fact that there was — you know, that trade credits were hidden from customers. Throughout the entire period, the company kept their customers from knowing that trade credits existed. And there would be no reason to do that except as part of a scheme to try to take this money that belonged to the customers into existence. They testified about a credit cleanup project that took place every month whereby credits were moved off the books at the end of — at every quarter. At the end of the quarter, the credits were moved off the books and moved into a holding account, which we think is the account that's described in the description by the defendants of what happened. And they also testified about these additional accounting allegations that involve sham sales and channel stuffing, a phony sales representative who nine different people who worked in sales said, yes, there was a guy named Matt Anderson who didn't exist, who had sales recorded in his name, and shipments of goods to a company, ECTC, Eric Crown, Tim Crown, the founders of the company, that was not a customer. And there are seven confederate witnesses in sales who said that goods were shipped to these customers. Why is that significant? If these transactions, which were done at the end of the quarter to inflate earnings, when they're undone, what happens? Even if the goods are not shipped, but the records show they're shipped, records show they come back, trade credits are issued. So in order to undo — in order to benefit from these transactions, except at the end of the quarter, you need to be able to take those trade credits into income because otherwise, you know, you get a benefit at the end of the quarter. Goods are shipped. It's recorded. But when that's reversed later, then you lose the benefit of that. We also have individual allegations about each of the named defendants there set forth in the brief. And so rather than go through them, unless you have any other questions, I'd like to reserve the balance of my time. You're free to do that. Thank you. Thank you. Good morning, Your Honors. Miles Ruthberg for Defendants at the Lease. May it please the Court. Judge Talman asked about the stock price in this case, and I would direct Your Honors to page 16 of our brief in which we cite the record on that. And this is an unusual case because in this case, by the time the consolidated complaint was filed, Insight's stock price had fully recovered and closed above the price that it was. But initially, it did drop from $5.90 to $3.05, right? Absolutely, Your Honor. Okay. Absolutely. And by the time the amended complaint was filed, as we say, it had gone up even higher. So just to be clear, we are not before the Court on loss causation. We are before the Court only on Scienter. But in terms of the overall setting here, this is an unusual case in the sense that the stock price did recover. The issue before the Court is only Scienter. And the district court's judgment should be affirmed because the plaintiffs failed multiple times to plead a strong inference of Scienter under well-settled Supreme Court and Ninth Circuit standards. I've always found it difficult to figure out what counts as an inference, a strong inference, a half-strong inference, or a really, really strong inference. It's some kind of a bizarre continuum that I'm probably only expressing my own view that it's quite difficult because it seems to me that it's at least a permissible inference of Scienter. And I'm not sure where strong comes into it or why it couldn't be a strong inference. And I'd appreciate your help. Yes, Your Honor, and I appreciate that this is a line-drawing exercise and at times not an easy one. I think the best guidance I can give Your Honor and the Court is to look to the prior decisions of this Court, and in particular the Metzler case, the Zucco Partners case, and the Dow case, which we discuss in our brief. And I think if you compare what's alleged in this case to what's alleged in those cases, it perhaps gives a calibration to what is necessary in order to satisfy the PSLRA. Okay, so in Metzler, there were confidential witnesses, and the Court said it's not enough because there was not evidence pleaded that showed an intentional or deliberate disregard of the accounting principles. And the decision is interesting because the CFO there has sold all of his stock. The accounting error was at least as simple as the one is alleged in hindsight to have been here. There, Your Honor, the issue was that the company was taking in as revenue an entire month's revenue when the students, this was a college organization, when the students were there for only a part of the month, the company was taking in as revenue the entire amount of the month. So that's pretty straightforward. It's pretty simple. And yet this Court said what we need in order to have a strong inference of Scienter, a cogent inference of Scienter, is evidence that the CFO knew that he was making an accounting error or deliberately disregarding. And in that case, there were witnesses who actually placed the CFO in the room when the accounting principle was being discussed, and there was apparently disagreement about the accounting principle. But that wasn't enough because you can make mistakes. Companies make mistakes every day, and Congress's intent was not to make into a securities fraud every accounting error that every company makes. Similarly, in the Zucco Partners decision by this Court, the Court, number one, sets forth its two-pronged test for confidential witnesses, which was not met here, and the district court carefully analyzed that two times over, and it was not met here. And then, importantly, the Zucco Partners Court goes on to analyze what kind of an accounting error does create a strong inference of Scienter. And the Court said, number one, you have to show that the top executives had access to the information, showing that there was a fraud, showing that it wasn't just a mistake but that it was a fraud, number one, clearly not met here, and the Court itself says that's a narrow exception. Or, two, it has to be the kind of thing that is so prominent that it's absurd, and that's the word this Court uses, absurd to suggest that top management didn't know there was a fraud going on. And the example the Court cites is the Burson case. And in the Burson case, the issue involved 25 percent of the company's revenues, whereas in this case, it's undisputed that it is a fraction of 1 percent of the revenue spread over a long period of time with amounts, as counsel concedes, that averaged $600 and were as small as a penny. So this case does not meet the test set forth in Metzler or in Zucco Partners. On the other hand, on the other hand, Your Honor, in the Dow case, this Court did find the allegations sufficient, and that's because the allegations were particularized and the facts, and I'm quoting, "'The facts alleged by plaintiffs lead to an even stronger inference. Plaintiffs have alleged with specificity that the top executives actually directed the improper revenue recognition in violation of both GAAP and their own accounting practices.' The Court also says that the confidential witnesses there, unlike in this case where the confidential witnesses are in the sales department, the collections department, and so forth, the confidential witnesses in that case were in the executive suite. They were in the accounting department, and there were some in the field services staff. And those witnesses gave specific evidence that defendants, and I'm now quoting, "'Defendants not only knew that the company's reported financials and earnings forecast were based on fraudulent accounting, but personally directed the violations of Dow's stated accounting policy and GAAP in order to artificially inflate revenues.'" Here, there are many confidential witnesses cited in the complaint, but what's notable and what the Court below found is that none of them, none of them testified about knowledge by the top executives that the accounting was wrong. In fact, none of the witnesses testify about the accounting at all in their allegations. They testify about sales credit practices. So respectfully, Your Honor, this case seems fairly straightforward when you lay it against the matrix that's set out by the Metzler case, the Zucco Partners case, and on the other hand, the Dow case. What's your response to Mr. Reprin's reference to, you know, the sham transactions, the sales to, I want to say ACDC, but I know that's not right. But you know who I'm talking about. It's close. ECTC. ECTC. Thank you. So, Your Honor, with respect to that, and I think this is indicative of the problem that the plaintiffs had and have in this case, none of those are pleaded with the particularity required by the Reform Act. And the district judge invited the plaintiffs to plead them with particularity if they could, and they don't identify those transactions with any specificity whatsoever. Moreover, and notwithstanding the allegations in the brief and again here today, those transactions are not in the complaint tied in any way to trade credits. And again, you know, if you lay that against the Metzler case, in Metzler, the plaintiffs unleashed a broad attack on the company there, claimed essentially everything the company did was wrong or unlawful or fraudulent. So is it your position that to the extent that evidence would be admissible at all, it would have to be offered on a theory of other bad acts that the company engaged in that must show that they had evil intent? Well, that would be unprecedented, Your Honor, if it were offered on that. And I think under this Court's guidance, it would have to be offered with some connection to the trade secrets accounting error in a way that showed that that was a fraud. And that's not done here, and that's why that evidence was rejected by the Court. Similarly, the channel stuffing allegations, again, they were brandished numerous times over, but they were never pleaded with particularity. And on the face of the complaint, the channel stuffing relates to large customers, and yet the trade secret issue relates to small customers. Trade secret? I'm sorry. Trade secret. I apologize. Trade credit issue. Hey, we're off in intellectual property somewhere. Okay. I apologize, Your Honor. Trade credits. And it's not connected at all to the trade credits, and that's again the flaw. And the reason that plaintiffs are trying to come up with these so-called additional accounting allegations is there's absolutely no evidence pleaded of motive in this case. And normally when you have a fraud or often when you have a fraud, there's some motive pleaded. It's a factor under the Supreme Court's guidance. Here there are no insider trading allegations. Well, I think that, as I understood the argument, the motive is to inflate the value of the stock generally by showing a higher income than is legitimate and lower liability than is legitimate. Yes, Your Honor. The motive. Yes, Your Honor. And that's true in every case. You know, every company has an incentive to show earnings and to have a high stock value. And so what this Court has said is for the evidence to be relevant to a strong inference of scienter, there has to be some other evidence of motive such as the executives trying to capitalize on this inflated stock price by selling their stock under suspicious or unusual circumstances. And that's what's totally missing in this case. There's none of that. So this is not a motive case. And, in fact, there are contraindicators here. It's undisputed that the company itself identified, investigated, and corrected the accounting error. So that's a contraindicator of scienter and not an indicator of scienter. I think with that, Your Honors, if there are questions, I'd be happy to answer them. But I think I have ‑‑ I'm sorry, there is one other point that the gentleman mentioned that I should address, collective scienter. The gentleman actually started with that this morning, and I think that's telling because there is no evidence, there are no facts pleaded here that create scienter by the individuals who signed or issued the financial statements here. And it's important, under this Court's guidance, and every court in the United States that's addressed this issue, the scienter has to link, on the one hand, the person who allegedly had responsibility for the false statement with a person who had knowledge or deliberate disregard that that statement was false. That has to be linked together. You can have an accounting error in a company, and if it's not linked to the people who are making the financial statements, that doesn't create scienter because it's not linked. I think what I heard, and I'll ask Mr. Whitman when he gets back up, but I think he was making a Bank of New England argument, which is the only analogy I can think of in the criminal jurisprudence where a bank was found as an entity to have intentionally violated the currency exchange laws through the actions of lower level employees who were basically taking money and not filling out the credit reports. That's the only case I'm aware of that supports that theory. Right. And in this case, Your Honor, again, we believe the argument has been waived regarding collective scienter. It was not raised below by plaintiffs, and we don't think their explanation is sufficient of why it was not raised. But even if it were not waived, the Glazer case sets out, again, very clear guidance as to what's required hypothetically, because it's never been recognized by this Court. It would be the first time. But hypothetically, you might have collective scienter if the facts are so dramatic that, again, that it's absurd to suggest that somebody at the company didn't know there was an accounting fraud going on. And the example that's given by this Court in the Glazer case is the citation to the example of GM reporting that it sold 1 million SUVs when the actual number is zero. That speaks for itself, obviously. This is not remotely in that universe, Your Honors, and we don't believe that even if the collective scienter argument were properly preserved, it would apply here. The New Mexico, Ernst and Young Broadcom case that was cited in the reply brief and again this morning, that's telling as well, because in that case, this Court says that the top engagement partners on the EY audit team were party to conversations in which they knew the accounting was not being properly followed and a misrepresentation was made at that time, the Court concludes, and then carried forward and incorporated by reference into the subsequent audit opinion that was at issue. That's a very different case. It in no way undermines or overrules Glazer, doesn't purport to, and Glazer is still the controlling test. Thank you, Your Honors. Thank you, counsel. Mr. Weprin, you have a couple minutes left here or some amount of time. I think the key in what the distinction between this case and the other cases he cited is those are cases where the question was, did the top executives know that the company policy was being violated? This is a case where the company policy was being followed and the company policy for trade credits itself was fraudulent. I mean, basically, and he still has not offered any explanation for why the company thought it could take trade credits, which were other people's money, and move it from a liability owed to customers into income conveniently between a year and two years before they would have to start to accede those trade credits to the state. And once they're acceded to the state, they're still other people's money. I mean, if the customer one day wakes up and some of these trade credits were millions of dollars, as there's statements from some of the confidential witnesses, if they suddenly woke up and found that they had never collected all this money, they could still go to the state to get it. And my argument about collective scanter was just to show the magnitude of this fraud. And we do cite cases from other circuits where leading a collective center is allowed, scanter is allowed. Some of them are mentioned in Glaser. What's your best case for that? I mean, do you agree that there isn't any case that says that yet? This is going to be the first one? I think the Seventh Circuit actually in Tell Labs on remand, I believe, talks about collective scanter. But as I say, the Seventh, the Second, and one other circuit have it. But I really think it's not necessary, because if, in fact, you accept the fact that the policy itself was fraudulent and they were following the policy, then it's clear that you can infer that the chief accounting officer and the two chief financial officers were aware of the policy, and they were aware the policy was being followed. And it just defies logic that a chief accounting officer or a chief financial officer who were responsible for the financial statements of the company, who are generally CPAs, but I don't know whether they were in this case or not. I assume they were, that they would think that you could take other people's money and magically snap your fingers and convert it into income. And that's what happened here. What's your response to the argument that you waive this collective scanter claim by not raising it below? Your Honor, it's not, it is, it's necessarily raised below, because count two of the complaint. And again, below, you know, we responded to arguments, but count two of the complaint says, which is the control person liability, says that Insight violated 10B, and the individual defendants controlled Insight. And then it's an affirmative defense, and so they didn't control it. Control person liability, actually, I think is going to have a renaissance now, because the Supreme Court in the Janus Capital case, after the briefing in this case was decided, basically said, well, you know, in that case, you know, only one person makes a statement, and anybody else could be liable as a control person. But I think the court below could not have dismissed count two without finding that Insight itself hadn't violated the 10B. And so that was necessarily passed on. It wasn't discussed in the briefs, because in the briefs, and we did discuss, you know, the fact that this was a company policy that was throughout the brief, that this was not an error, you know, like an error. This was not confusion about what the rules are. There can't be any confusion, and I want to make this very clear. There cannot be any confusion in the mind of any reasonable chief financial officer or chief accounting officer that these trade credits belong to Insight or could belong to Insight. They belong to the customers. After the customers don't want them, they go to the state who holds them until the customers ask for them again. Thank you, counsel. The case just argued is submitted, and we appreciate the very interesting and helpful arguments from both sides. And we will take about a 10-minute break before the rest of this morning's calendar.
judges: Timlin, Graber, Tallman